United States Fire Insurance v. Kelman Bottles, Kelman Glass, Continental Casualty  Oh. Your attorneys have taught us a lot about glass furnaces. Very interesting. It's one of the nice things about doing insurance law. You learn a lot about tangential, the underlying issues in dispute. May it please the court, Michael Connolly on behalf of Appellants, Kelman Bottles and Kelman Glass, I'd like to reserve six minutes for a rebuttal. Sure. We're here today to address insurance coverage for the loss that Kelman suffered on March 15, 2011. We're approaching the two-year anniversary of that date, two years since Kelman has been shut down and over 100 employees laid off because of the insurance company's refusal to comply with their contractual obligation. To add insult to injury, the district court here granted summary judgment for the insurers by relying upon or by ignoring controlling legal standard, drawing inferences against Kelman and ignoring Kelman's evidence. Can I take you, because I know we've all read the briefs and have a handle on your arguments, but I'm wondering if you can help me sort out the burden of proof on causation here. Is it accurate that in the first instance the insurer's got a burden to show that the loss is covered, even under an all-risks policy, that you fit within the risks covered? It's the policyholder's burden to prove that the loss triggers the policy under the applicable coverage granting provision. And does that mean that you've got the responsibility to prove that the event was fortuitous, not in a happy sense, but an accidental sense? It is. I think Pennsylvania has adopted, like most states, the public policy arguments over fortuity. So if it's your burden in the first instance to come forward and say, this was an accident and we're covered, this risk is covered, and now the fight is over, what's the cause, et cetera, et cetera, do you have an obligation to point to a covered cause? Because if you've done that, I'm not zooming in on it, maybe you can help me do that. What's the cause that was covered by, first, the all-risks policy for the U.S. fire that you've pointed to to meet your burden in the first instance? For the U.S. fire policy, as you mentioned, it's an all-risk policy. So the coverage granting provision says that if there is a loss, it is covered unless it's excluded. And it uses the term loss. Whatever the cause? So whatever the cause, if there's damage to property, it's covered under an all-risk policy. But it still has to be a fortuitous cause, right? It still has to be. That's the heart of the problem. It still has to be a fortuitous cause, and that's why courts looking at fortuity apply. It's a very easy test for a policyholder to make. In fact, in the INA versus U.S. Gibson case, that was a subsidence case, and fortuity was argued in that case. And what the court looked at was even though subsidence is a risk associated with every mining activity and that subsidence had happened to this property of U.S. Gibson many times in the past, there was never property damage, an insurance claim for property damage as to subsidence. So what the court looked at was the expectation of the loss. Was that fortuitous? And that's what we argue here. The question is, for fortuity, did Kelman expect this loss? And our argument is that it did not. So... What's your response to the district court's assertion, and something that your opponents hit pretty hard, which is you did expect this loss. Your plant manager was telling them repeatedly, hey, we got a problem, we got a serious problem. You had the big meltdown, the significant event two years earlier in April of 2009. You had experts in and you didn't follow up on what they said to the full degree they suggested. This was an accident waiting to happen, and when it happened, everybody who was in the know knew something was going to happen. And the precise location was also identified. I'm sorry? The location was also identified. I mean, in the furnace, it wasn't just these were not general recommendations. These were specific recommendations. Well, you know what? The problem that I had at the district court was the district court not digging into the details about the evidence that you all are relying upon or you all are mentioning here. Because we think when you start looking at that evidence and start peeling away the layers, the inferences actually support our argument that it wasn't expected. And let me just give you one example. I don't particularly like to dig into the details too much at the appellate level, but I think it's important here. Because some of the questions that you're asking, we tried to convey to the district court. The district court's process was you submit proposed findings of fact, and then underneath them you submit your counter to that. The district court completely ignored our counter. So just to give you one example, because it's the evidence that the district court says is the most compelling evidence. In the opinion, it's the most compelling evidence, and the insurance companies both cite to it. And this is a series of emails from February 2011. And you look at those emails, the language that they quote says, should we be worried? I think we should be extremely worried. And then goes on to quote the issue that was being raised. My knowledge of this furnace now, you get to understand what they were talking about here. The furnace contains glass in the melter area. The glass is then fed by gravity like a bathtub into the bottling units at one end. The issue that was addressed in this email is what's called the checker, which is above the melt line of the glass. So that issue could not have resulted in a leak, because the glass is below that area. What they were concerned about initially was that there was escape, because some cracks in it, there was some escape of heat, which goes to the efficiency of the furnace. So the escape of heat, coupled with the condition of this block, what my client was concerned about was the potential that a block could fall into the furnace and clog the throat, clog the drain. It would not have resulted in a leak. Yet that is the evidence that the district court points to as the most compelling evidence that Kelman expected a leak. It had nothing to do with the sidewall. It had nothing to do with the risk that a single block would have a hole come through it. Okay. Take it that that's true. Can you answer the question, though, that the district court was getting? I understand that you're not happy with the factual underpinning that was relying on, but the holding of the district court is essentially, you knew you had a problem with this furnace. You'd had significant, not minor leakage, but significant leakage previously, brought experts in. They recognized you had this risk and recommended something for you all to do, and you didn't follow up on it. So this loss was not unexpected in that sense. This loss was something which was expected. What's the error in that reasoning? The error is you're drawing inferences from evidence that I don't think should be drawn, and you're ignoring the evidence that Kelman has. So it's ignoring the summary judgment standard. It's ignoring the summary judgment standard, and, quite honestly, it's wrong. Again, if you look at the evidence and you peel back the layers, each piece of evidence falls apart. I mean, we prepared kind of a chart in our reply that goes to the evidence, and we show why we think it's not just that the inferences should have been drawn in favor of us, but that the facts are wrong, the repairs that were recommended. The history of this furnace was that for decades at every furnace they repaired the melt line, which is the area most susceptible to corrosion. They never overcoated a sidewall block. I'm sorry. Let me ask you one other thing, Mr. Connolly, and maybe you can't put any more of a point on it than you already have. What is the covered cause of the molten glass leak? What's the covered cause, and what evidence is there that that was a substantial approximate cause? Well, for the continental policy, we don't have to prove the cause of it. The issue is the damage, whether it's expected. For the U.S. fire policy, it's our position that since they're relying upon an exclusion, a causation exclusion, that they are required to prove the cause of the loss. I'm getting into an Alphonse and Gaston problem here about who goes first. If you have the burden in the first instance to show that you've got a covered cause, how do you get to them failing with their burden? We don't need a covered cause. We need a covered loss. The policy granting provision says that if there's damage to personal property under the all-risk policy, it's covered. So all we have to prove is that there's damage to covered property. If they are going to exclude it because they say the cause was an excluded cause, they have to establish that the cause was the sole excluded cause. But you have to at least prove, before you get to them on that, don't you have to prove I've got something covered by this all-risk property in the sense that there was a fortuitous event? We do have to prove, but fortuity goes to the expectation of damage, not cause. It goes to the expectation of damage. Again, if I bring you back to that U.S. Gibson case, a loss can be fortuitous even if it's probable. It's a looser standard than even accident where it's substantially certain, but a loss can be fortuitous even if it's a probable event, and there's a whole series of cases that talk about that. What we're talking about is the degree of risk here. One quick question before you sit down. The additional coverage extensions, there was an additional premium paid for that. Is that correct? It's actually referenced in the underwriting as being added to the policy. It's something that was specifically added to the policy. U.S. Fire could have chosen several different endorsements to add that coverage, and this was the one that was purchased. The purchase of that coverage was fairly expensive? The purchase of all this coverage was fairly expensive, Your Honor. I mean, this is not – you know, this is a – furnaces are expensive endeavors to ensure. But, I mean, for this one alone, the fact that they put it on, it was well paid for. It was well paid for, Your Honor. Yes. Good. Thank you. Mr. Lies, please. Thank you, Your Honor. Good. Good morning. May it please the Court. Christopher Lies for United States Fire Insurance Company. I'd like to jump right in and address some of the questions that were raised during Mr. Connolly's argument. With regard to the facts pre-dating the March 11 occurrence, the evidence indicates, as Your Honor, Judge Sirica said, that there was a – a contractor came in, Glass Furnace Management, and identified the need to do repairs to the precise location where this loss occurred on the north side of the melter, the one that brings us here today, the insurance claim. The contractor indicated that that wall was suffering from severe erosion and wearing away, and that the entire – that entire sidewall – this is like a – has four sides to it. That north wall needed to be repaired, to be covered. That was not done. And those facts are not in dispute. Does it – are you blowing past a lot of facts in Kelman's favor? I mean, you heard Mr. Connolly stand up here and say, look, the district court was just actually wrong about these particular facts and drew inferences against us instead of in our favor on your motion for summary judgment. And that's problematic. There was no – no evidence in this case that the loss was unexpected? Your Honor, that's – As opposed to perhaps a cause, but that the loss was unexpected. Two issues, fortuity and exclusions. You brought up the issue of burden of proof. It is certainly the policyholder's burden of proof to come forward with some evidence that the loss in question was fortuitous. This record indicates that this commercial insured was on specific notice of the need to do repairs. They did not do the repairs. Well, that's not true. They did do some repairs. Some repairs. They may not have done all the repairs that you, in denying coverage, say they should do, but this wasn't a case where they were ignoring the issue. They recognized an issue. They had advice. They did what they thought was appropriate under the circumstances. Does the fact that they didn't maintain the furnace in the way you think is best mean they're without coverage? And, in fact, they said that this type of recommended repair had never been done and would have the effect of weakening the furnace. That is what they said. Doesn't that make a material issue a fact? No, Your Honor, because the cause of the loss, the essential reason for the decision below was the district court's conclusion that an exclusion applied. They came forward with no evidence of a cause of loss. We move down to cause of loss, which is subsequent, Your Honor, to fortuity. Cause of loss. That's the essence of the coverage issue here. And every potential cause of loss is an excluded cause of loss. The one highlighted in the district court's opinion is inherent vice, a quality and property that causes it to damage or destroy itself. Yeah, now the district court didn't call it inherent vice. It kept calling it inherent risk, which is a different kind of problem, right? No, I disagree, Your Honor, respectfully. He cited the policy exclusion, the district court judge. He cited the GTE case that interpreted the exact same exclusion in a property policy. He applied the test from this court in GTE v. Allendale. So you're saying it's an inherent vice? That was the basis of the district court's opinion. Would you at least agree that inherent vice and inherent risk are two different concepts in insurance law and that he called it the wrong thing, even if you say he was applying inherent vice? I think in the beginning of the discussion he said inherent vice. Really? I thought he did. And he referred to the GTE case, which was an inherent vice case. Okay. So with inherent vice, though, inherent vice cases, they're about things that have, if I understand it right, the seeds of their destruction within them, so to speak. You know, the line about food rots and iron rusts and some wine doesn't travel well, etc. I mean, this is a furnace. It's not like rotting food. It's like any other piece of machinery. It will deteriorate over time. But the fact that something deteriorates over time doesn't mean that it's got an inherent vice and is therefore uninsurable. Otherwise, one would think you guys are in the fraud business, right? Because you took their money. If there was an inherent vice here because a furnace wears out over time, can that really be an exclusion? Yes, Your Honor, indeed, because the facts of the case, and again, these were completely from the admissions of the witnesses from Kelman. They established, and the court relied on the admissions, that this is how these furnaces operate. The interaction between the glass and the refractory block causes it to erode over time. And for that reason, every 10 years, Kelman relined its furnace, and this furnace had been relined just five years ago, so the inherent wear that was expected from having the molten glass in there wasn't that part of this 10-year renewal, and no one said that that was an improper maintenance schedule, and this schedule had been, in fact, adhered to. Just as with a car, if service is necessary, here service was necessary. After this leak, what they found was a hole showing that the thickness had worn down to 10% of the original thickness. That's a statement that something wears out. I mean, I think you're actually getting to the point. Nobody would say you can't insure your car because cars break down. How can you say it's an inherent vice and therefore an uninsurable risk that a furnace wears out after 10 years? The concept behind both the wear and tear exclusion, which I haven't even gotten into yet. Right. We're talking about inherent vice, and I'm having trouble understanding that. I know, but every other cause of loss that the plaintiffs have proffered in their reports is an excluded cause of loss. Erosion, wear and tear, cracking, every single possible cause of loss is an excluded cause of loss. What if you never know the cause of loss? The cause of loss is unknown. Well, we're getting that into the doctrine in Pennsylvania under property insurance law of efficient proximate cause. Ultimately, what the court has to do is examine the facts of the claim, the facts of the loss, and determine the efficient proximate cause. That's the law in Pennsylvania. The Yonis case from Judge O'Neill, affirmed by this court, Judge Van Aske in the THE case, Trexler, which is a Pennsylvania Supreme Court case, what is the efficient proximate cause of the loss? And the evidence in this case was undisputed that every possible cause of loss, which is really where we go with regard to exclusions in property insurance policies, was an excluded cause of loss. We came forward with that evidence on the motion for summary judgment largely by way of admission, by admission, and the other side came back with nothing. There was nowhere for the judge to go on this motion. There was no issue for a jury with regard to any other cause of loss other than an excluded cause of loss. This loss happened because the walls of the refractory wore away. What did you insure for them? What did they get for their hundreds of thousands of dollars? Fire, lightning, vandalism, earthquake, earth movement, earth subsidence. There are many external causes of loss. This was a really expensive policy, and the risks that you're describing there are pretty ordinary, and they paid for more than an ordinary policy. It was expensive because this was a very big facility, Your Honor. It was a big facility with a furnace, right? With one furnace operating at a frig, which was operated much more than it should have been, and where the refractory blocks wore away sooner than would have been expected. But they knew that. They chose not to do the repairs, and they had previous leaks. So does the inherent vice of theory, does this depend on maintenance, on complying with whatever an outside consultant says must be done in order to keep it in good repair? Because everyone agrees that the nature of this kind of furnace is that it's going to deteriorate. That's correct. Because of inherent properties of the bricks and so forth. So it would seem to me that if the consultant had not come in and requested these repairs to be made, that seemed to me to be the key part of your argument on inherent vice, that it seems to have nothing to do with the inherent nature of the bricks that are going to corrode. Well, in GTE, what the court said was seeds of its own destruction. This particular operation will result in the wearing away of these refractory blocks. It happens. So there's a duty to repair? There's no duty to repair. It's an excluded cause of loss. It's very simple. It's an excluded cause of loss. That just strikes me as an extraordinary. You send somebody in. They look at the risk in advance. It's not U.S. Fire's first trip around the block with furnaces, I'd be willing to bet. You know the nature of the risk. And you sign up on an all-risk policy and then say the character of the furnace puts it in an exclusion. It's just not covered, period. That's your position, right? But there are other exclusions as well. Wear and tear. Wear and tear clearly applies here. Let's stick with what you're talking about and what the district court was talking about. You've said to us that an inherent vice is uninsurable, and I guess I'm trying to push you on that because if that's true, what a remarkable thing that you'd take their money. Doesn't it strike you as odd to say, you know what, I'll insure that car against all breakdowns, but since cars break down, once you call me for insurance coverage, I'm going to say no, it's not covered. What's the difference between what you're saying is the inherent vice of a furnace wearing down and a car breaking down? Machinery of all sorts, over time, wears down and breaks. How can it be the case that inherent vice covers the wear and tear on a machinery? The industry provides a mechanical breakdown policy. This is not a mechanical breakdown policy. This is a property policy. Fire, explosion, hurricane, external causes. That's what this court pointed to in the GTE case. That is the theme in the cases that have talked about inherent device. What does all risk mean? All risk means sudden and accidental fortuitous. Physical loss, except as excluded, and every possible cause of... And should that, in theory, cover leaks? Not under these circumstances. What was the additional coverage extension for then? The additional coverage extension... That covers molten metals. Your Honor, the additional coverage extension was an extension of damages to provide coverage for additional damage in the event of covered, covered... Well, now, that's an issue of fact, or an ambiguity in the policy. What does covered refer to, the adjective covered? Does that refer to just covered water or liquid? Or does it jump over with the next or and covered molten metal as well? You know, you've got two ors in there, don't you? And isn't it a little difficult to say the first, the word covered at the beginning attaches both to both sides of the or, the first or, but also to the events following the second or. I think the district court correctly indicated it's a matter of law for the court and that the policy provision is unambiguous. We have cited five reported decisions, none from the circuit, but including a Fifth Circuit decision, a Fifth Circuit decision and a decision from the Western District of Texas, all of which interpreted the exact same provision and held that the loss in the first instance must be covered in order for that extension of coverage to apply. And basically what they're saying is that if you have to move something, such as an appliance, in order to get at something behind it to do the repair if there's a leak, we will also cover for the removal of that appliance. So that, the focus of that endorsement, and I'm not aware of any evidence in the record, Your Honor, of an additional premium for that. I'm not aware of any evidence of an additional premium for that. That was part of the policy form. That is what that provision applies to. It's an extension of additional damages, i.e., the cost of removing appliances to get behind there if you have a leak. Wouldn't that be covered by the policy in the first place? No, that's, in this instance, the molten leak is not covered. That's what the district court found. And your all-risk policy doesn't cover all the repairs unless you have also an additional coverage or extended coverage. Coverage under the policy is provided for the repair of direct physical loss to property. It could be that you have to move an appliance, a heater, some kind of a mechanical appliance that is not damaged, has not been damaged, so there would not, without that coverage... That wouldn't be covered unless you brought extra coverage? That's correct. And we cited a case from the federal court in Pennsylvania that explains this, which is that without that extension, what the policy requires for indemnification is direct physical loss. So it might be that you need to move something, take it out, in order to get access to a leak behind it. That is providing coverage for the cost of removal of such an appliance, but only in the event of covered loss, as was held by the Fifth Circuit in the General Accident v. Unity case. Any other questions? Good. Thank you very much. Bad faith with us. Just rest on our boots. We understand your position on that. Mr. Gere. Thank you. Please, the court. My name is Paul Gere, I represent Continental Cash in the county. Continental Casualty's policy is different than U.S. Fire's policy for an obvious reason. It's not an all-risk policy. It ensures the furnace. Now, what the court looked to in evaluating the Continental Casualty coverage was the condition of the furnace. Kelman seeks to point the court in a different direction. Kelman seeks to look at the expectation as to whether or not the leak occurred in a given area, whether or not the leak occurred and got beyond the control of its workers, and whether or not the leak occurred and got into the basement. In other words, the way the molten glass flowed. The Pennsylvania courts, however, have not dealt with it in that manner. The Olitski v. USAA case, which was already... Before you go there, Mr. Gere, can you help me with the sudden and accidental piece of this? You argue that this wasn't sudden and accidental because the furnace regularly experienced leaks. Is that right? That's correct. All right. But you were selling breakdown insurance to your client, right? I mean, in essence, what this policy is about is insuring the furnace against breakdown? That's correct, Your Honor. Okay. So if it's in the nature of these types of furnaces to have an occasional leak, and you know that that's part of the risk involved, what makes it less than sudden and accidental when you have a catastrophic event like this? At the point where you've had it happen before. We're not talking here about seepage. We're not talking about mere seepage where you put a little water on it and it all hardens. What we're talking about here is an entirely different thing. The purpose of these refractory block walls, these blocks are huge, they weigh 1,000 pounds. Their only purpose is to hold the molten glass inside the containment area. It's not supposed to get out. Now, they have an emergency procedure to deal with if it does get out. But at the very time when it gets out and starts to get out of control, but your workers arrest it, you know you have a problem. And the court's well aware of all the people that came in and told them they had problems. And what did they do? They did a partial overcoat. Underneath the partial overcoat, we still have the same refractory block walls. They're getting thinner. It's been two years between the time they got the warning through the thief. Yeah, but it's a recognized sort of 10-year useful life, right? I mean, that's... Do they assert that that's kind of an industry standard? They've been on that rotation. They heard the advice of the experts. They did what they thought was appropriate. I'll ask you the same thing that I asked your colleague, Mr. Leeser. Are you asserting that they've become uninsurable? They've somehow violated their right to coverage by not doing everything that the expert said? Not precisely that. But we're dealing on what is expected and what is more specifically what was not unexpected. You shouldn't have a major loss. They had one in 2009. They managed to control it. They had a two-year avenue of time, and it's not going to get any better over that time. But they did some repairs. Sure. They did some repairs. And in 2010, we have a second loss. It's in the south wall instead of the north wall. But they have only overcoated the melt line. And where did the loss occur in 2010? Underneath the melt line. It should have been noticed that they needed to do more overcoating. And going back to what the district court pointed to, the one glass line management comes in and recommends that you overcoat more of the north wall, and they didn't do that. We get into 2011, and that's exactly what occurs. Can I ask you a question about what the effect of a rule of the sort you're suggesting would be? Isn't it to kind of create a perverse incentive for people not to look into problems? Because what it sounds like you're suggesting, Mr. Gere, is they had an expert in. He made recommendations. They didn't follow all of them, and therefore they've got no coverage. So the smart play next time is you have a problem, don't invite an expert in, just do some repairs you think are good, because then you can never have your insurance company come in and deny you for the loss, saying you didn't do everything the expert suggested. Well, Judge Jordan, that may appear to be a disincentive. It sure does. I'm asking you why it isn't. Well, it isn't for the simple reason that we're looking here at whether or not the loss is a sudden and accidental loss. And we are looking for the knowledge they have. And their contention that these particular things that happen in this loss never happened before really fail when you apply logic and common sense to it, because if this stuff gets outside, there's going to be this problem. I thought your own investigator went in there and looked at this and said this was unexpected. I mean, isn't that what the Continental person said when they went in and investigated it? Well, he said that's what they said. That's what Kelman said. Kelman said it was... I mean, the people that went in, went in on day two, and there was still molten glass in the furnace, and they couldn't examine anything, and all they really did was repeat what was inside the... what the Kelman people told them in a meeting. And that was essentially that. And that's in a report from the Continental person, right? Isn't that enough of a fact issue? The loss was deemed sudden and accidental in the Continental report. Now, okay, isn't... Deemed by... You're saying they said it. They're saying you said it. Isn't that a material issue of fact? I don't believe so, Your Honor. Judge Roth, what happens... This is information that is coming in very quickly. After one meeting, a few days after the loss... Often that information that comes in very quickly at the beginning turns out to be the most accurate because no one is second-guessing what they're saying. And no one's massaging it. Well, that's the initial information. The information that comes in ultimately, the court looks or the company looks at it. They make a coverage decision. And the coverage decision is at least deemed by the district court to be reasonable enough that they grant summary judgment. Now, even if this court should disprove it... And that's what we're here about. Could, in a circumstance like this, where there's two sides arguing about whether something's sudden and accidental, and somebody from your side of the ledger says sudden and accidental, isn't that something then that goes to a jury to decide who said what when and what it means? And not for a judge to sit back and say, you know what, I think Continental wins. How do you square that with the summary judgment standard? I don't believe it's the same thing at all, Your Honor, because what has occurred here is we have information that's uncontested from Kelman which is presented to the judge. And this is totally different than what someone writes in a claim log two days after. If you applied that standard to every decision made on every insurance case, you'd never have a summary judgment because information comes in and ultimately someone has to make a decision based on the information. In this particular case, the district court's decision was made almost entirely on uncontested information. The words by Kelman's people, the recommendations made by Kelman's people, and then looking at the loss, concluding that this was not an unexpected loss because of all the notice they had. The fact that they chose to bury their heads in the sand and perhaps not deal with the specific threats that they knew they had, keeping in mind that Mr. Hilliard, when asked for a repair estimate just days before this loss, said what we need is a total rebuild. My colleagues will indulge me, I know you read my son, but I want to ask if I can, if you can make a distinction, is there a distinction between an unexpected loss and an unexpected cause? Because the district court and you in this argument here seem to be saying this cause was not unexpected. People expected a problem with the wall. At some point there was going to be a problem. Is that different, though, than the loss, the character of the loss, the catastrophic nature of it, the damage to the furnace itself, which everybody seems to agree had never happened before with any previous leak, including the one in 09. Is there a distinction between an expected cause and an unexpected cause and an unexpected loss? Well, I think the unexpected cause is a more specific thing than the unexpected loss. In the unexpected loss situation, we may be looking at more, but certainly we're looking at the nature of the loss. The nature of the loss here involves refractory blocks, and we have the condition of refractory blocks, which are the things which the court pointed to in terms of what is expected and what is not expected. And the condition of the refractory block, which is what Continental ensured, was very much an issue here because of the previous leaks. These things are not supposed to leak like this. They had one in 2009, 2010, and again in 2011. And when you find out in 2009 that you don't have much time left because the walls are getting thin and you don't do anything about it, what can you do with those facts other than conclude that this loss was not unexpected? Otherwise you could sit around forever and not ever do anything. So it's a distinction without a difference, is what you're saying, the difference between loss and cause. I think cause is more specific, and cause is not even relevant under this policy. Okay, thank you. Thank you, Mr. Baird. Mr. Connolly. A few quick points if I could. Judge Sirica, you mentioned the recommendations that were made by the outside consultant in your questioning of me, and then Mr. Lease characterized those representations in his argument, and he said that the recommendation was that the entire wall, the north side wall where the March 15th events happened, that entire wall was recommended to be overcoated. They said that in their briefs as well. That's simply not the case. The recommendation said scope includes overcoating five sidewall blocks. There are dozens of sidewall blocks in this furnace. They can never identify the five that GFM asked to overcoat. And again, our maintenance people with 50 years of experience in this plant concluded that it would be more damaging to overcoat a sidewall block than any benefit that you would get out of it. What GFM recommended was overcoating the area that wears the quickest, which is the metal line. They only recommended overcoating a certain portion of it. Kelman overcoated the entire metal line. By making that argument, are you conceding, Mr. Connolly, that if you didn't do everything that was suggested to you by the expert, that you were putting yourself in danger of not being covered? No, absolutely not. I'm just raising that this is a factual issue. I think that if you look at the facts of it, the inferences, what actually happened, we win on that argument. But at the very least, a fact finder should consider what they say the recommendations were, what they say the significance of the recommendations are, what we say we did, why we said we did it, and then make a factual finding from that. So I don't think that's the case. But I think here, we did more than recommended, and there is no evidence that what was recommended, because it was not done, caused this loss. And I think that's the significance. Mr. Lease also said that his policy requires an external cause. This is not an external cause policy. They could have written an external cause policy, and we point to policies in our briefs that require an external cause. This policy does not do that. Next, on the ambiguity in the additional coverage endorsement, the Hartman case spells out the ambiguity. The Hughes case, also another Pennsylvania case, distinguishes Hartman, but essentially adopts the underlying premise of Hartman, which is in the Hartman exclusion, it provided additional coverage. What Hughes says is because the policy in Hughes was different, the Hartman analysis didn't comply, and significantly in Hughes, the additional coverage extension said only for covered loss, which is not in this policy. With regard to the continental policy, significantly I think what Mr. Lease, or what Mr. Geer started off with, he said what we are talking about here is something different than minor seepage. That's it. That's the point. What we were talking about before March 11th was minor seepage. We're talking about... I thought April 09 was a whole lot more than minor seepage. We're talking about... You're correct, Your Honor. There were leaks that were more than just minor seepage, but neither of those leaks led to any loss, which I think is the key. Mr. Geer says there was a loss in 2009. There was no loss in 2009, and the area of that leak was where we overcoded following that. In 2010, there was no loss in 2010. There was a leak, and it was controlled according to their standard operating procedures. But the leaks tell you something, do they not? Leaks can tell you something, and obviously you factor in the leaks in terms of what needs to be done with the furnace, where the leaks are, but furnaces leak. As the Superior Aluminum case demonstrates, which is a U.S. Fire case, furnaces leak. It's just the nature of the beast because they're not sealed walls. Here, the issue, though, is you had one specific location in one block where this leak began, and I think that's the significance. In terms of their sudden... I'm sorry. Hold on just a second, because I'm not sure I understand the answer to that question. You say leaks happen in these furnaces. I think everybody is prepared to acknowledge that there is, by the character of the design here, some seepage occurs, but the assertion is you had two events, in 2009 and in 2010, which were not seepage. They were significant events, and the fact that it didn't kill the furnace on those occasions doesn't mean that it shouldn't have told you this is now at serious risk. There's a different order of peril involved here. It's not seepage. It's a significant event. What's wrong with that reasoning? That's the reasoning they put to us, which is you may not be dead yet, but you're going to be dead soon assertion. You don't have a cold. You've got cancer. What's wrong with their arguing to us that those 2009 and 2010 events were significant enough to put you in a position of not being covered because you didn't do anything to deal with them? I think the 2009 event, the reaction to that event was the overcoating. Under your analysis, there was an obligation to react and look and see maybe there's something going on here. The reaction to that was overcoating. For the 2010 event, I think what they would have to prove in order for that argument to really control is that the events and the cause of March 11th or March 15th were similar in terms of the cause of the prior leaks and that, therefore, Kelman simply ignored something. They don't do that. There's no evidence that the cause of the block failure in 2011 was the same as the cause of the leak in 2010. If I could just on the sudden accidental real quickly, insurance people do not use the term deemed sudden and accidental likely. That is a significant legal concept in insurance and a claims handler is not just going to haphazardly say sudden and accidental in a report. But even if Mr. Gere is right that they got that from Kelman and even if Kelman used the word sudden and accidental, that's the point. Sudden and accidental deals with Kelman's expectations. So if all they were reporting were Kelman's expectations and Kelman's thoughts of this leak that it was sudden and accidental, then we win. But I don't think you can have three separate people all conclude that it's sudden and accidental. Let me ask my colleagues if they have any other questions. Thank you, Mr. Feiglman. Thank you very much. The case was well argued. We will take the matter under the cross.